Edward Q. LUPIA, Plaintiff-Appellant,

v.

STELLA D'ORO BISCUIT CO., INC.,
Defendant-Appellee.

No. 77-2142.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 15, 1978.

Decided Nov. 15, 1978.

Bernard M. Kaplan, Skokie, Ill., for plaintiff-appellant.

Joel A. Haber, Chicago, Ill., for defendant-appellee.

Before SPRECHER, Circuit Judge, NICHOLS, Judge,* and BAUER, Circuit Judge.

NICHOLS, Judge.

Plaintiff-appellant, Edward Q. Lupia, was an exclusive distributor of defendant's ethnic bakery products in the Chicago metropolitan area from 1961 until 1972. Defendant-appellee, Stella D'Oro Biscuit Company, Inc., is a New York corporation. In 1972, Lupia brought an action against Stella D'Oro, alleging that Stella D'Oro's marketing practices had violated various provisions of the Federal antitrust laws, specifically section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, section 3 of the Clayton Act, 15 U.S.C. § 14, and sections 2(a) and 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(a), (c). Plaintiff seeks monetary relief under section 4 of the Clayton Act, 15 U.S.C. § 15, the remedial provision allowing recovery of treble damages by "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws * * *." The terms of the

* Judge Philip Nichols, Jr., of the United States Court of Claims is sitting by designation.

agreements between the parties and the defendant's allegedly illegal practices are detailed below.

Both plaintiff and defendant filed motions for summary judgment in the district court. The motions were based on a substantial record assembled by discovery and affidavits, establishing beyond the mere allegations of the pleadings, what the plaintiff was and was not able to prove. Judge Flaum granted summary judgment to defendant on all four counts of the complaint, and denied summary judgment to plaintiff. We affirm.

■ Before discussing the contentions of the parties regarding the antitrust claims, it is necessary to comment on the role of a summary judgment in antitrust cases. In any type of litigation, the standard for granting summary judgment is strict. In *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1961), *citing Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944), the Supreme Court enunciated that standard, declaring that summary judgment was proper:

> * * * "only where the moving party is entitled to a judgment as a matter of law, where it is quite clear what the truth is, * * * [and where] no genuine issue remains for trial * * *." 368 U.S. at 467, 82 S.Ct. at 488.

*Poller* is the classic case cited for the proposition that courts should exercise extreme caution when deciding to grant or deny summary judgment in antitrust cases. In *Poller,* plaintiff alleged that CBS's cancellation of an independent UHF station's network affiliation was part of a conspiracy to restrain UHF broadcasting in the Milwaukee area. The majority in *Poller* believed that plaintiff should be given the opportunity to pursue discovery and attempt a showing of conspiracy at trial. Mr. Justice Clark's majority opinion, in reversing the D.C. Circuit's grant of summary judgment, stated that:

> * * * We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and in-

tent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. * * * [Footnote omitted—368 U.S. at 473, 82 S.Ct. at 491.]

But this court and other circuit courts have not interpreted *Poller* or similar statements by other courts to preclude use of summary judgment in antitrust litigation. *See, e. g., Crest Auto Supplies, Inc. v. Ero Mfg. Co.,* 360 F.2d 896 (7th Cir. 1966). The issue in *Crest* was whether the court could decide if the parties were *in pari delicto.* Stating that the court did not quarrel with the *Poller* view that summary judgment should be used sparingly in cases where *"motive and intent play leading roles,"* this court affirmed grant of summary judgment despite *Poller* because the factors cited in *Poller* (proof of subjective states of mind, genuine issues of material fact) were not present there. 360 F.2d at 899–900, (emphasis in original).

A similar situation exists in the present case. The intent of Stella D'Oro is not at issue. Rather, the issue is whether plaintiff has alleged any facts demonstrating a violation that "fits" within the requirements for an antitrust recovery, a question of law that can be answered by the court. *Compare ALW, Inc. v. United Air Lines,* 510 F.2d 52 (9th Cir. 1975). Here the Ninth Circuit affirmed grant of summary judgment for defendant on antitrust claims. The court held that plaintiff had merely alleged the existence of a "contract, combination, or conspiracy," under section 1, and that once defendant rebuts such an allegation by affidavit, plaintiff must set forth factual support of the conspiracy's existence in order to withstand defendant's motion for summary judgment. The court also dismissed plaintiff's claim under section 2 of the Sherman Act, since plaintiff showed "no monopoly power or dangerous probability thereof" existing in the relevant market. 510 F.2d at 57.

■ Although the strict standards for grant of summary judgment, and the complex legal and factual nature of antitrust

cases have made many courts reluctant to grant summary judgment in antitrust cases, technically there is no requirement that judges exercise greater caution in granting summary judgment in these cases than in any other. The Advisory Committee note accompanying Fed.R.Civ.P. 56 (1938) states that "[t]his rule [governing summary judgment motions] is applicable to *all* actions." (emphasis supplied.)

Indeed, the very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work, but also, (without intending any slur on plaintiff here), the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation, see *Poller, supra,* 368 U.S. at 474, 82 S.Ct. 486 (Harlan, J. dissenting). The ultimate determination, after trial, that an antitrust claim is unfounded, may come too late to guard against the evils that occur along the way. Judge (now Chief Judge) Skelly Wright, in a libel case, *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), noted that:

> * * * Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement. * * * [*Id.* 125 U.S.App. D.C. at 35, 365 F.2d at 968.]

In *Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 498 (7th Cir. 1972), this court has stated:

> * * * Appellate courts should not look the other way to ignore the existence of the genuine issues of material facts, but neither should they strain to find the existence of such genuine issues where none exist. [Citation omitted.]

As there held, mere recitation of antitrust claims in a complaint does not render that complaint immune from summary disposi-

tion, if uncontradicted facts show otherwise. If a trial would serve no useful purpose, summary judgment is proper. *Solomon v. Houston Corrugated Box Co., Inc.,* 526 F.2d 389, 393-94 (5th Cir. 1976). Assuming then, as is proper in summary judgment cases, that all facts as stated by the party opposing grant of summary judgment are true, we now examine the case at hand to determine if defendant is entitled to summary judgment.

### Price Discrimination Among Retailers

Count I of plaintiff's complaint alleges that defendant granted favored retail chain stores a 5 percent discount on the retailer's wholesale price charged, and then charged back the cost of that discount to the plaintiff-distributor. Defendant's system operated as follows: plaintiff generally bought bakery products from defendant for the retailer's wholesale price (RWP) minus 26 percent. Plaintiff sold and delivered the products to retail food stores through driver-route salesmen employed on a commission basis. The salesmen would collect the payments from the retailers, and return them to plaintiff. With chain stores, however, a different system was used. Plaintiff would still buy the goods, but the salesmen-drivers did not collect payment from the retailers; rather, they returned an invoice to plaintiff, taking their commissions. Plaintiff sent the invoice to defendant, and defendant billed the chain stores directly, deducting a discount of generally 5 percent. In its monthly billings to plaintiff, defendant charged him for the 5 percent discount.

Since the defendant did not make this "discount" available to an independent purchaser, argues plaintiff, it violated the price discrimination prohibitions of the Robinson-Patman Act, sections 2(a) and 2(c), 15 U.S.C. §§ 13(a) and (c). Section 2(a) of the Act prohibits discrimination in price between different purchasers of commodities of like grade or quality where:

> * * * [T]he effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, de-

stroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: * * *. [15 U.S.C. § 13(a).]

In dismissing the 2(a) claim, Judge Flaum ruled that (a) plaintiff lacked standing to challenge any price discrimination imposed on *retailers,* and (b) plaintiff had alleged no injury to himself or his business that resulted from defendant's discriminatory practices. The reason given for lack of standing was that the plaintiff was not within the "target area," the proper parties with standing being the retailers, not parties here. As to lack of injury, Judge Flaum says plaintiff failed to show he could have sold to the chain stores if the 5 percent discount had not been granted them. Thus, plaintiff does not have any claim under section 2(a).

 In holding that plaintiff was not within the "target area," Judge Flaum was not exactly coining a phrase. The authority he refers to, *Multidistrict Vehicle Air Pollution M.D.L. No. 31 v. Automobile Manufacturers Ass'n, Inc.* 481 F.2d 122 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Mfg. Ass'n,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), carefully and exhaustively analyses the various circuit positions on "standing to sue," counting the number that purport to measure standing by the "target area" test and those that require that the statutory "injury" be a "direct" one. In n. 7, p. 127, that court expresses uncertainty about the Seventh Circuit position but considers it closer to "target area" than any other. As stated in *Multidistrict Vehicle Air Pollution, supra* at 125, the purpose of both standing rules is to limit the "availability of section 4 relief only to those individuals whose protection is the fundamental purpose of the antitrust laws." It would appear the circuits all view the treble damages suit as too lethal a cannon to put in the hands of anyone who has suffered only an "indirect," "secondary," or "remote" injury. Since *Multidistrict Vehicle Air Pollution, supra,* which expresses doubt about the position of the Fifth Circuit, that circuit has come down hard for the "target

area" test in *Jeffrey v. Southwestern Bell,* 518 F.2d 1129 (1975). The recent Supreme Court decision, *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), does not speak expressly in terms of standing to sue, but at any rate holds that a conspiracy to fix prices of cement building blocks to general contractors cannot be sued on under section 4 by owners whose cost of new construction may be indirectly enhanced, none of the contractors being parties to the suit. Likewise, not only must the injury be direct, but it must be of the kind the antitrust laws were written to guard against. This was fatal to the suit under section 4 in *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), where Brunswick Corp. had purchased certain failing bowling centers to keep them in business, and the injury to the plaintiffs, independent bowling centers, was loss of the additional business and profit that would have inured to them if the failing centers had been allowed to fail, and thereby had ceased to compete. Here again the matter is not stated in terms of standing to sue. The courts demand, either in terms of a standing doctrine or in terms of a requirement of *antitrust* damages (as in *Brunswick, supra*), that recovery be confined to those who have been injured by restraints imposed by defendant on competitive forces in the economy. *GAF Corp. v. Circle Floor Co.,* 463 F.2d 752 (2d Cir. 1972), *cert. dismissed,* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973). One commentator has noted that the courts are uncertain as to the precise relationship between "standing" and the requirement of "antitrust damages." M. Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977,* 77 Colum.L.Rev. 979, 996 (1977). The Ninth Circuit in *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495 (9th Cir. 1977), seems to merge the requirement of "antitrust injury" with the general standing barriers which all antitrust plaintiffs must overcome. Judge Hayes in the *GAF* case, *supra,* implies that "standing" and "antitrust damages" are two different methods

of viewing the requirement of "injury to business or property" for section 4 purposes, when he states:

> * * * [W]hether GAF is viewed as not having "standing to sue" for these alleged violations of the antitrust laws, or, is viewed as not having sustained anticompetitive damages from the particular acts alleged, the result under § 4 is the same, and the dismissal of the complaint for failure to state a claim upon which relief can be granted was correct. [463 F.2d at 759.]

The Supreme Court's *Illinois Brick Co.* case, *supra*, reversed a decision of this court, *State of Illinois v. Ampress Brick Co.*, 536 F.2d 1163 (1976), which treated the matter as one of standing to sue and held that one who suffered an indirect injury could have standing. We relied on *Malamud v. Sinclair Oil Co.*, 521 F.2d 1142, 1151 (6th Cir. 1975), the authority of which case would seem now to require reconsideration.

 One of the beauties of modern summary judgment is that it need not be confined to threshold issues such as standing. It may invoke any reason why a claim or defense must succeed or fail. Thus, whatever reasons there may once have been to attack "injury" or "target area" problems early by saying they relate to standing, on summary judgment this classification loses its urgency, and becomes more or less moot. It would not do plaintiff any good to persuade us to select, as Judge Flaum did, among the various section 4 standing and injury doctrines. It is clear plaintiff could not prevail under any of them. The independent retailers, who did not enjoy the 5 percent rebate, solely occupied the "target area" and plaintiff improperly sues as surrogate for them. As regards "antitrust injury," plaintiff does not pass the *Brunswick* test. The defendant's anticompetitive action, the 5 percent rebate to chain stores, would have been equally anticompetitive if plaintiff had not been required to absorb it. That he was so required is, therefore, not an "antitrust injury" but one reflecting harsh treatment of a distributor by a manufacturer. If defend-

ant had absorbed the rebate, there would have been no injury, yet the anticompetitive nature of its policy would not have been affected one iota. So it is not an "antitrust injury." Judge Flaum found that plaintiff was unable to raise an issue of fact that it could have sold to the chains without the rebate. This serves to distinguish *Greene v. General Foods Corp.*, 517 F.2d 635 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976), otherwise quite like this case on its facts, and heavily relied on by plaintiff here. It was found Greene, a distributor, could have sold to his fixed price customers at higher prices than General Foods would allow, and with higher prices there, Greene could have reduced his prices to unfixed price accounts and thereby competed more effectively with other distributors. *Id.* at 643. Though the case was decided after trial and "standing" terminology is not used, it is clear Greene placed himself within the "target area" and demonstrated "antitrust injury" in a manner not equalled by the plaintiff herein. There is no further issue of fact to be decided: the issue is whether the facts as plaintiff presented them, taking plaintiff's version as true, allow plaintiff to assert an antitrust claim under section 2(a). We hold that he may not and affirm the grant of summary judgment to defendant on the 2(a) claim.

### The Brokerage Claim in Count I

Judge Flaum also ruled that plaintiff had not shown that the 5 percent discount was "in lieu of brokerage" as required to establish a violation of section 2(c) of the Robinson-Patman Act. Section 2(c) prohibits the payment or acceptance of a "commission, brokerage or other compensation, or any allowance of discount in lieu thereof," except for services rendered in connection with a sale of goods. 15 U.S.C. § 13(c).

 Section 2(c) does not, as plaintiff maintains, cover all indirect price concessions. Section 2(c) was enacted in order to prevent discriminatory rebates granted large sellers under the guise of "brokerage fees" never actually earned. Congress out-

lawed unearned brokerage fees *per se* in order to force sellers to confine their discriminatory practices to those dealings whose effect could be more readily measured by the competitive yardstick of the 2(a) test. *Federal Trade Comm. v. Simplicity Pattern Co.,* 360 U.S. 55, 68–69, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); *see also* H.R. Rep. No. 2287, 74th Cong., 2d Sess. 16 (1936). But nowhere has plaintiff shown how these discounts are brokerage discounts in lieu thereof. The discount is straightforward and not disguised in any manner. Thus, a *per se* rule eliminating examination of competitive effects, used in brokerage cases and discounts in lieu of brokerage, where anticompetitive practices and effects are hard to identify, is neither necessary nor proper here. Thus, we return to the 2(a) test, which requires an examination of competitive effects on plaintiff, effects which plaintiff fails to demonstrate.

### The Sherman Act Allegation in Count I

Plaintiff objects to Judge Flaum's dismissal of the Sherman Act section 1 claim allegedly lurking in Count I.

■ Plaintiff argues that the 5 percent discount constituted an illegal form of price fixing because the discounts were "a fixed and integral component of" the "fixed" wholesale price. Plaintiff asserts that a price-fixing claim was inherent in paragraph 20 of its complaint. But paragraph 20 does not even cite Sherman section 1, and prior pleadings and rulings of Judge Flaum indicate that the price-fixing violation alleged in Count I had been understood to be excluded from this action both by the parties and the court. In any case, the lack of standing and antitrust injury are as much fatal to this claim as it has been shown to be to the other Count I claims.

### Price Discrimination Among Distributors

■ The gravamen of plaintiff's Count III claim is that defendant granted a 29 percent trade discount to some distributors and a 26 percent discount to plaintiff, thus committing price discrimination in violation of section 2(a) of the Robinson-Patman Act. Plaintiff's claim fails as he does not allege that any competition existed between the favored and disfavored wholesalers.

■ As discussed above with regard to standing, the maintenance of healthy competition is the focus of the antitrust laws and remedies. Plaintiff notes that section 2(a) prohibits price discrimination when the effect may be "substantially to lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 13(a). Therefore, he argues, he need only show a general threat to competition in any market to effect his own recovery. But plaintiff's argument ignores the case law requiring that, for a private antitrust action, a plaintiff who is a customer of the discriminating defendant and not a direct competitor of that defendant (a plaintiff involved in "secondary line competition") has standing only to raise those sales which are injurious to his competition. *Mayer Paving & Asphalt Co. v. General Dynamics Corp.,* 486 F.2d 763 (7th Cir. 1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974). Plaintiff must show that he competes with those customers receiving the favored prices. *Chicago Sugar Co. v. American Sugar Refining Co.,* 176 F.2d 1, 7 (7th Cir. 1949); 16H J. Von Kalinowski, Business Organizations: Antitrust Laws and Trade Regulations § 68.04 (1978), and cases cited therein.

Cases cited by plaintiff in support of the proposition that plaintiff need not show that his own competitors are receiving a favored price are cases where the plaintiff was a competitor of the very defendant who is charging the discriminatory prices. In these so-called "primary line" cases, the parties to whom defendant is granting favored prices need not be direct competitors of the plaintiff, since it is assumed that in that situation, defendant has the ability to seduce customers of plaintiff with an offer of lower prices while maintaining profits by a discriminatory charge of higher prices to "steady" or obligated customers. But this advantage of defendant is of no consequence to plaintiff if plaintiff does not compete with the defendant.

*Atlas Building Products v. Diamond,* 269 F.2d 950 (10th Cir. 1959), cited extensively in plaintiff's brief to support the argument that he need not show his own competitive situation, is really a "primary line" case concerned with geographic price differentials. And Judge Flaum points out that the court in that case actually states that primary line cases are "clearly distinguishable from suits filed by a local purchaser against a manufacturer, where competition between purchasers is of course essential to actionable price discrimination * * *." 269 F.2d at 954.

 Therefore, plaintiff must allege and demonstrate that he was a disfavored purchaser who competed with favored purchasers, and was injured as a result. And since plaintiff has not adequately challenged the validity of defendant's exclusive territorial restraints (see discussion of Counts II and IV below), plaintiff must prove this competition to obtain a remedy despite the fact that defendant may have imposed or encouraged territorial restraints that may have made competition among distributors unlikely.

Plaintiff alleged that he did show harm resulting from "secondary price discrimination" since he lost sales in Benton Harbor, Michigan, where another distributor had a better discount. Questioning at oral argument attempted to elicit the scope and breadth of that competition, and from that questioning, it seems that the right to an exclusive dealership in the Benton Harbor area was in dispute, and that defendant finally told plaintiff that it was operating outside of its territory. More importantly, though, plaintiff could not detail the extent of its activity in the Benton Harbor area, the customers he would have been able to deal with absent the discriminatory price, or an estimate of sales actually lost. Thus, plaintiff has not alleged that its sales lost due to secondary price discrimination were more than "de minimus," or that they even potentially existed. Yet this court has required such a showing, for if there exists only "de minimus" or sporadic competition, it is unlikely that a "lessening of competi-

tion" or "tendency to create a monopoly" will occur. *Universal Rundle Co. v. Federal Trade Comm.,* 382 F.2d 285, 287 (7th Cir. 1967); *Whitaker Cable Corp. v. Federal Trade Comm.,* 239 F.2d 253, 256 (7th Cir.), *cert. denied,* 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761 (1956).

Finally, plaintiff's contention that its competition with defendant in sales to institutional buyers resulted in a showing of "primary line discrimination" for which recovery is possible, fails. The exclusive distributorship did not apply to sales to "institutions," *i. e.,* airlines, restaurants, etc. Both plaintiff and defendant sold to them, or rather to jobbers who sold to them, in the same Chicago area. First, this argument was initially made in plaintiff's opposition to the summary judgment motion, and being unnecessarily delayed, is not properly before this court. Second, there is no showing here of the extent of lost sales, and no connection is demonstrated between defendant's discriminatory sales to other territorial distributors, and defendant's ability or intent to prevent plaintiff from obtaining a superior competitive position vis a vis defendant in institutional sales. In *Crest Auto Supplies Inc., v. Ero Mfg. Co.,* 360 F.2d 896, 901 (7th Cir. 1966), the fact that plaintiff failed to allege "any competitive effect or competition in any sense, nor set forth any facts concerning the unspecified discrimination from which such competitive effect may be inferred," resulted in dismissal of the Robinson-Patman claims from plaintiff's complaint. In addition, Judge Flaum thought it inherently impossible for illegal competition to exist where a manufacturer competes directly with his own distributor. That is his privilege, according to *Chicago Sugar Co. v. American Sugar Refining Co., supra,* at 10.

### Restrictive Agreements

Counts II and IV are both based on agreements between plaintiff and defendant, agreements which plaintiff alleges impose illegal restrictions on him. Count II involves an agreement between plaintiff and defendant in which plaintiff was for-

bidden from selling bakery products manufactured by anyone other than defendant, unless that "foreign" bakery product was bought through the defendant. Plaintiff alleges that this is a restraint and product "tie in" that is a *per se* violation of Sherman § 1 and Clayton § 3, 15 U.S.C. §§ 1, 14. Damage claimed is the difference between the higher prices plaintiff paid defendant for outsiders' bakery products (a 26 percent trade discount) and the lower price that would have been paid had plaintiff bought directly from the manufacturer (a 40 percent trade discount). Damages total $16,800.

Count IV concerns both this restriction and a non-competition agreement under which plaintiff agreed (1) not to sell defendant's products outside its defined territory, and (2) to refrain from competition with defendant within a 100-mile radius of plaintiff's place of business for a period of one year after termination of his distributorship. Count IV also avers that the exclusive dealing agreement alleged in Count II, taken in conjunction with the price-fixing and marketing restraints imposed by defendant, was part of an illegal price-fixing scheme and/or pattern of practice of defendant to control and fix the products' prices and the distributive practices under which they were sold. In Count IV, plaintiff seeks damages of $35,000 by reason of the exclusive dealing agreement and $20,000 due to the covenant not to compete. Plaintiff also sought injunctive relief in his initial complaint.

The allegations requesting an injunction against defendant's vertical price-fixing schemes were dismissed from Count IV by Judge Austin in his order of October 29, 1974, since plaintiff had not alleged any threat of present or future loss to himself as 15 U.S.C. § 26 requires. In that order, Judge Austin provided that "the other aspects of Count IV * * * will stand." These "other aspects" are the only remaining issues for discussion here; they are the exclusive dealing agreement and the covenant not to compete. The price-fixing claim is not properly before this court.

■ Plaintiff is not entitled to damages due to these agreements because he fails to allege violations of section 3 of the Clayton Act and section 1 of the Sherman Act that would entitle him to damages. Section 3 of the Clayton Act makes wrongful any contract for the sale of goods, or a fixed price or rebate on such a contract, on condition that the lessee or purchaser shall not use or deal in goods of a competitor of the lessor or seller, where the effect of such a sale, lease or contract would tend to create a monopoly in any line of commerce. 15 U.S.C. § 14. And courts have held that agreements with manufacturers that limit distributors' sales to products made by the manufacturer are not *per se* violations of antitrust law. Such an agreement is barred by section 3 of the Clayton Act only if its effect "may be to substantially lessen competition or tend to create a monopoly in a line of commerce." In *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), summary judgment had been granted plaintiff below, on the theory that defendant's franchise contracts were *per se* violations of Sherman Act §§ 1 and 3. The Supreme Court reversed and remanded, saying:

> * * * We do not know enough of the economic and business stuff out of which these arrangements [vertical territorial limitations] emerge to be certain [that their sole purpose is to stifle competition]. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business [citations omitted] * * *. We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack * * * any redeeming virtue" [*Northern Pacific Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1956)] * * *. [372 U.S. at 263, 83 S.Ct. at 702.]

This reasoning holds true today. *Pitchford v. Pepi, Inc.,* 531 F.2d 92 (3d Cir. 1975),

*cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Giant Paper & Film Co. v. Albermarle,* 430 F.Supp. 981, 984 (S.D.N.Y.1977).

Therefore, plaintiff must allege some facts to demonstrate that defendant's marketing practices foreclosed competitors of the defendant from a substantial market. But as defendant noted, the trial court found that plaintiff was totally unaware of the share of the relevant market foreclosed by the exclusive dealing agreement. The court in *Becker v. Safelite Glass Corp.* 244 F.Supp. 625, 639 (D.Kan.1965), granted summary judgment for this reason alone. *See also Mercantile National Bank of Chicago v. Quest, Inc.,* 303, F.Supp. 926, 934–35 (N.D.Ind.1969) (plaintiffs had not proved an antitrust violation since they presented no evidence of plaintiffs' position in the relevant market).

■ Also, clauses restricting distributors after termination of contracts are legal unless unreasonable as to time or scope. *Snap-On-Tools Corp. v. Federal Trade Comm.,* 321 F.2d 825, 837 (7th Cir. 1963). Plaintiff's complaint never alleges that the distributorship restriction was unreasonable; thus, he has not claimed that this restriction violates the antitrust laws in any manner.

■ Finally, there is no illegal tie-in arrangement in this case. Tying agreements were made illegal under the Sherman Act to prevent the anticompetitive occurrence of a party dominant in one market (the tying market) controlling another market (the tied market) via his competitive advantages in the tying market. *Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277 (1952). Given this policy, then, for a party to establish a violation of the antitrust laws using a tying arrangement theory, he must demonstrate that there exists (a) two separate markets for the tied and tying product, *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.), *cert. denied* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1971); and (b) a requirement that plaintiff buy a tied product as a condition of obtaining access to or a concession from defendant in the tied market. *Capital Temporaries, Inc. of Hartford v. Olsten Corp.* 506 F.2d 658 (2d Cir. 1974); *Holleb & Co. v. Product Terminal Cold Storage Co.,* 532 F.2d 29 (7th Cir. 1976). There is only one market here (ethnic bakery products) and plaintiff alleges no instance when defendant forced him to purchase one product as a condition of buying another.

■ In determining that defendant is entitled to summary judgment on all four counts, we realize that the plaintiff may have been harmed due to defendant's business practices. But plaintiff cannot recover under the antitrust laws, because he has not raised any issue of fact indicating that defendant's anticompetitive practices caused injury to plaintiff's competitive position. Plaintiff must raise these issues of fact successfully to oppose defendant's motion for summary judgment. It is the focus on the maintenance of competition that is the basis for the antitrust laws, their remedies, and the requirements for parties to recover under them. Plaintiff fails to raise any issue of fact showing that he meets the requirements for antitrust recovery, so the decision of the lower court granting summary judgment to defendant is

AFFIRMED.