## EASTERN AUTO DISTRIBUTORS, INC., Plaintiff,

v.

## PEUGEOT MOTORS OF AMERICA, INC. and Automobiles Peugeot, S.A., Defendants.

### Civ. A. No. 81–733–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 17, 1983.

---

Wayne Lustig, Judith M. Ziegler, Guy, Cromwell, Betz & Lustig, Virginia Beach, Va., for plaintiff.

Conrad M. Shumadine, John Y. Pearson, Jr., Bruce T. Bishop, Willcox, Savage, Dickson, Hollis & Eley, Norfolk, Va., for defendants.

## ORDER AND OPINION

DOUMAR, District Judge.

Eastern Auto Distributors, Inc. moves this Court under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss a counterclaim filed by Peugeot Motors of America, Inc. (hereinafter PMA). The basis for the requested dismissal is the contention that the counterclaimant seller lacks standing to allege antitrust and contractual violations against the buyer.

PMA is a Delaware corporation with exclusive rights to distribute French manu-

factured Peugeot automobiles in the United States. Title to the vehicles is transferred to PMA in France who then delivers the cars to Eastern Auto Distributors, Inc. (hereinafter EAD), a Virginia corporation. EAD then purchases the cars from PMA and resells them to retail dealers located throughout the southeastern United States. Counterclaim, ¶ 6 and ¶ 7. EAD also recruits and enfranchises the various retail dealers located within their distribution area. Counterclaim, ¶ 7. From 1958 to 1980, EAD was also the distributor and enfranchisor of Renault vehicles. Counterclaim, ¶ 8. This counterclaim arises in the context of a much larger action instituted by EAD against PMA and PMA's parent company, Automobiles Peugeot, S.A., alleging in seven separate counts various breach of contract, antitrust and Dealer Day in Court Act causes of actions.

The counterclaim alleges that EAD engaged in widespread illegal tying arrangements from 1972 to 1980. PMA states EAD used its economic power to require new retail dealers to carry both Peugeot and Renault vehicles. Counterclaim, ¶ 9. If a dealer wanted only a Peugeot franchise he was required to operate a Renault franchise, and vice versa. *Id.* Some dealers accepted both franchises but others who declined to accept the arrangement were denied either franchise. Counterclaim, ¶ 21. Additionally, PMA alleges that EAD instituted a policy of not filling dual dealer vehicle orders unless the dealer ordered both Peugeot and Renault automobiles. Counterclaim, ¶ 12. PMA recognizes that various makes of cars have different appeals to different retail dealers, and, therefore, acknowledges that Peugeot was either the tying or tied product depending on the retail dealer's purchasing desires. PMA's Memorandum of Law in Response to EAD's Motion to Dismiss at 1–2 (hereinafter PMA's Memorandum).

PMA asserts three separate counts against EAD. Count One states that many dealers were denied Peugeot franchises or failed to order as many vehicles as they would have absent the tying agreement resulting in a substantial lessening in competition and an unreasonable restraint of trade in violation of § 3 of the Clayton Act. 15 U.S.C.A. § 14.[1] Count Two alleges that the retail dealers who acquiesced to the dual dealership arrangement or agreed to order both Peugeot or Renault vehicles engaged in a "contract, combination or conspiracy in restraint of trade" in violation of § 1 of the Sherman Act. 15 U.S.C. § 1.[2] Counterclaim, ¶ 28 and ¶ 29. Count Three asserts a breach of the Distributor Agreement between PMA and EAD. Counterclaim, ¶¶ 35–40. Essentially, PMA states EAD failed to use their "best efforts" to assure an effective distribution network in the sale of Peugeot products. Counterclaim, ¶ 38.[3]

1. Section 3 of the Clayton Act, 15 U.S.C. § 14, provides in pertinent part that: "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods ... for use, consumption or resale within the United States ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly..."

Count One of PMA's counterclaim alleging a violation of § 3 of the Clayton Act does not specifically assert an executed contract, lease or sale required by the statute. *McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332, 337–38 (4th Cir.1959). For the purposes of this analysis, the statement in PMA's Memorandum at 15

that Paragraphs 21 and 22 of the counterclaim stating "numerous dealers acquiesced to EAD's demands" will be interpreted to constitute an executed agreement between EAD and the retail dealers.

2. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in pertinent part "Every contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

3. "Paragraph 2 of the Distributor Agreement provides that EAD will fully cooperate 'in making and promoting the sale and service of Peugeot products to dealers and to the general public.'" Counterclaim, ¶ 35.

"Paragraph 19 of the Distributor Agreement provides that EAD 'will organize and maintain a distribution network for the purpose of distributing and selling Peugeot products to the gener-

■ EAD contends that PMA lacks standing to assert these claims arising from the unlawful tying arrangement between EAD and the retailer dealers violating the anti-trust laws. EAD Brief in Support of Motion to Dismiss at 3 (hereinafter EAD Brief). Allegedly, PMA has not demonstrated an antitrust injury of the type the antitrust laws were designed to prevent. In this unique situation where Peugeot can be either the "tying" or the "tied" product, EAD states that when Peugeot is the *tied* product, the unexpected sale of any additional Peugeot automobiles can only increase PMA's profits and, thus, fails to demonstrate any injury. PMA concedes that this analysis is correct as to the dual orders of Peugeots and Renaults, but rebuts this proposition as to prospective dealers who were denied Peugeot franchises arguing that PMA lost the benefit of the best possible retail dealers being forced to accept less competent retail dealers due to EAD's actions. Counsel for PMA, Oral Argument, August 15, 1983. When Peugeot was the *tying* product, EAD argues PMA is asserting the possible antitrust claims of retail dealers and, therefore, has not alleged an injury to its own business by reason of a violation of an antitrust statute thereby precluding a grant of standing as to Counts One and Two.[4]

■ Secondly, EAD contends that the contract claim must be dismissed because the asserted breach is based on the allegedly defective antitrust claims. EAD Brief at 7. This argument is without merit. Count

Three states EAD did not use their "best efforts" as required in the Distributor Agreement. Counterclaim, ¶¶ 35–40. Although EAD's tying practices may not bootstrap PMA into a grant of standing to assert an antitrust claim, the same practice may be sufficient to allege a breach of contract. *Parmalee Transportation Co. v. Keeshin,* 292 F.2d 794 (7th Cir.1961) *cert. denied,* 368 U.S. 972, 82 S.Ct. 376, 7 L.Ed.2d 401 (1961); (The use of conventional antitrust language in drafting a complaint will not extend the reach of the Sherman Act to wrongs not germane to that Act, even though such wrongs are actionable under state law. *Id.* at 804). Accordingly, EAD's Motion to Dismiss is DENIED as to Count Three, which count alleges a contractual breach.

The issue remaining is whether a supplier of automobiles has standing under § 1 of the Sherman Act and § 3 of the Clayton Act to sue a mid-level distributor for allegedly engaging in a tying arrangement with retail dealers. Standing under either § 1 or § 3 is determined in accordance with § 4 of the Sherman Act, 15 U.S.C. § 15. *Central Chemical Corp. v. Agrico Chemical Co.,* 531 F.Supp. 533 (D.Md.1982). Section 4 reads as follows:

> Any person who shall be injured in his business or property *by reason of* anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained,

al public in a dignified and efficient manner.' " Counterclaim, ¶ 36.

"Paragraph 21 of the Distributorship Agreement states that EAD 'will at all times use its best efforts to assure effective and proper performance by [its] distribution network in the distribution and sale of Peugeot products.' " Counterclaim, ¶ 37.

**4.** EAD also contends that their refusal to deal with prospective franchisees who would not accept a dual Peugeot and Renault dealership failed to state a claim upon which relief could be granted. EAD Brief at 1. Although a *unilateral* refusal to deal with prospective customers does not violate antitrust provisions, a fraudulent, collusive refusal to deal as part of a conspiracy does encompass an antitrust infraction.

*United States v. Colgate,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 624 F.2d 476 (4th Cir.1980) *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) ("A business may unilaterally choose those with which it will conduct business" *quoting Colgate, supra.*) Whether EAD's actions were unilateral or in conjunction with the dual dealers who eventually accepted both lines of cars is a question of fact to be raised as a defense and is not appropriate for resolution on a motion to dismiss. However, resolution of this issue is not necessary because this Court finds that PMA lacks standing to assert either claim arising under the antitrust statutes.

and the cost of suit, including a reasonable attorney's fee.

(In pertinent part; emphasis added).

 Such antitrust standing requires a greater showing of injury than the minimal injury-in-fact test mandated by the Article Three "case and controversy" constitutional requirement. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The plaintiff must demonstrate that the antitrust injury is of the type the antitrust laws were designed to prevent and that the injury flows from that which makes the defendant's acts unlawful. *Id.* at 429 U.S. at 489; 97 S.Ct. at 697.

The Seventh Circuit Court of Appeals in a recent decision, *Bichane v. Chemetron Corp. (In re Industrial Gas Antitrust Litigation)*, 681 F.2d 514 (7th Cir.1982) *cert. denied*, 459 U.S. ——, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), discussed the perimeters of antitrust standing under § 4 and articulated a clearly defined two step analysis that helps remove the obtuseness and obscurity surrounding the issue. *Id.* at 515. First, the plaintiff must allege an antitrust injury "which is inextricably related to, and caused by, the alleged anticompetitive conduct." *Id., citing Brunswick, supra.* Second, the court must determine if the plaintiff is the proper party to bring suit. *Id.; citing Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

In *Bichane*, an employee refused to follow his employer's directives requiring him to violate the antitrust laws and, subsequently was fired. The Seventh Circuit Court of Appeals, applying the test outlined above, held that the employee lacked standing under § 4 to assert a claim based on the antitrust violations. No antitrust injury was established which flowed from the lessening of competition, rather the Court stated the injury was inflicted by the employer's coercion and the employee's ultimate discharge was a matter concerning labor practices which antitrust laws do not address. "Thus a mere relationship with the anticompetitive scheme is insufficient to bring the injured party within the scope of § 4; only where the injury is directly related to the scheme's anticompetitive effect does § 4 apply." *Bichane* at 515. Having found no antitrust injury, the Court proceeded to hold also that Bichane was not a proper plaintiff interpreting § 4 to require a direct causal link between the antitrust violation and the resulting injury in order to prevent the courts from being flooded by antitrust litigation instituted by remote parties. Although recognizing that antitrust standing is not limited to consumers, the court stated that § 4 does limit standing to those plaintiffs who are efficient enforcers of antitrust laws. *Id.* at 520; *citing Illinois Brick, supra,* and *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir.1971) *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). The Seventh Circuit Court of Appeals further recognized the conflicting policies behind antitrust laws attempting on one hand to deter future violators and compensate victims of anticompetitive practices while on the other hand attempting to prevent excessive treble damage litigation.

 The lower federal courts consistently have held that antitrust violators do not create causes of action for all persons tangentially harmed. *Associated General Contractors v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia, Inc. v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972). We must be extremely cautious in granting a person who is neither a consumer nor a competitor the right to treble damages as a private attorney general. *Associated General Contractors, supra* at 909. The possibility of such a large recovery affords a special temptation for the institution of vexatious litigation. *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1167 (7th Cir.1978). In relation to the allegations of the counterclaim, PMA is neither a consumer nor a competi-

**948**

tor and therefore this Court must carefully scrutinize the position of PMA and decide: one, if PMA has suffered an antitrust injury; and two, whether PMA is an appropriate enforcer.

## I. ANTITRUST INJURY

■ An antitrust injury is demonstrated when the plaintiff establishes an injury of the type the antitrust laws were designed to prevent and that the injury flows from that which makes the defendant's act unlawful. *Brunswick Corp., Inc. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). The plaintiff's loss must occur "by reason of" that which made the defendant's act violative of the antitrust laws.

■ PMA asserts that it was injured by reason of EAD's tying practices. Tying arrangements are unlawful under both § 1 of the Sherman Act and § 3 of the Clayton Act to prevent anticompetitive actions by a party dominant in one market (the tying market) from controlling another market (the tied market) via his competitive advantage in the tying market. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1952). In most antitrust tying cases, the plaintiff is either an unwilling purchaser or a competitor of the tied product. *David R. McGeorge Co., Inc. v. Leyland Motor Sales, Inc.,* 504 F.2d 52 (4th Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *Advance Business Systems and Supply Co. v. S.C.M. Corp.,* 415 F.2d 55, 60 (4th Cir.1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970); *McElhenney Co., Inc. v. Western Auto Supply Co.,* 269 F.2d 332 (4th Cir. 1959); *Lupia, supra; Central Chemical Corp., supra.* Tying arrangements are prohibited in order to foster free competition and not to protect a wholesale distributor. The antitrust injury harms competitors and consumers due to the lessening of competition and does not result from a possible decline in sales experienced by a seller.

The Court recognizes that PMA's claim is unique and no case is clearly definitive of the present situation. However, both the Second and Seventh Circuit Court of Appeals have held that a plaintiff/supplier lacked standing to assert an antitrust tying claim against the buyer stating that the plaintiff was merely a collateral third party victim whose injury was too remote and unrelated to the anticompetitive practice to justify antitrust standing. *Repp v. F.E.L. Publications, Ltd.,* 688 F.2d 441 (7th Cir. 1982); *Fields Productions, Inc. v. United Artists Corp.,* 318 F.Supp. 87 (S.D.N.Y. 1969), *aff'm* 432 F.2d 1010 (2d Cir.1970), *cert. denied* 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971). *But see Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir.1970), *cert. denied* 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971). Similarly other federal courts have limited the right of a seller/distributor to assert other antitrust claims against their buyers. *GAF Corp. v. Circle Floor Co., Inc.,* 463 F.2d 752 (2d Cir.1972) *cert. denied* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973); *Calderone, supra,* (a nonoperating landlord has no standing to assert an antitrust cause of action against a tenant); *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183 (2d Cir.1970), *cert. denied* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971) (franchisor denied antitrust standing against franchisee); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383 (6th Cir. 1962), *cert. denied* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963).

■ In applying the *Brunswick* analysis defining an antitrust injury to PMA's counterclaim asserting an unlawful tying arrangement this Court finds that PMA fails to allege a sufficient antitrust injury irrespective of whether Peugeot is either the tied or tying product. PMA's injury resulted from a breach of its contractual agreement with EAD, in that EAD allegedly selected less competent dealers. Antitrust laws were designed to foster competition and were not created to protect a distributor who claims that as a result of a tying arrangement the defendant "compromised the effectiveness of its dealer network."

PMA Memorandum at 3. PMA has not shown why this alleged contractual violation should give rise to the antitrust treble damages. PMA was not forced to purchase an unwanted product nor did PMA experience any reduction in competition as a result. The retail dealers forced to purchase unwanted automobiles and their competitors are the ones injured by reason of that which makes EAD's tying practice violative of the antitrust laws. PMA suffered no antitrust injury.

## II. PROPER ENFORCER OF ANTITRUST LAWS

Although this Court finds that PMA has failed to allege an antitrust injury, we will assume such injury exists in order to complete the analysis of whether PMA is a proper party to enforce the antitrust laws. No court has held that every plaintiff however remotely injured by an antitrust violation has standing to sue. *See e.g., Associated General Contractors, supra,* — U.S. at ——, 103 S.Ct. at 907; *Blue Shield of Virginia, supra,* 457 U.S. at 476, 102 S.Ct. at 2547; *Hawaii v. Standard Oil, supra* at 405 U.S. at 263, n. 14, 92 S.Ct. at 891, n. 14.

Recently, the United States Supreme Court in *Associated General Contractors* delineated the various factors a lower court should consider in determining which parties have sufficient interest to efficiently enforce the antitrust laws. The Supreme Court stated that a district court primarily should consider the relationship between the plaintiff's harm and the defendant's wrongdoing. Subsumed within this general analysis the lower court must examine the defendant's intention to harm the plaintiff, the nature of the plaintiff's injury, the presence of a more appropriate plaintiff with a right to maintain the suit, the possibility of speculative or multiple recovery, and the important federal interest in keeping complex antitrust trials within judicially manageable limits.

In applying the factors listed in *Associated General Contractors* to PMA's situation, this Court first notes that although a remote, but conceivably causal, relationship exists between the harm PMA suffered and EAD's wrongdoing, the injury is not sufficient in light of the other articulated factors to justify a grant of standing. The mere fact that PMA may have suffered a reduction in sales or that the best dealers were not selected as a result of EAD's tying practice does not end the inquiry into whether PMA is a proper enforcer. A number of other factors may be controlling.

Here, the person directly harmed was the retail dealer or the purchaser who was impeded in obtaining a car as the result of the dual ordering system. PMA's injury, if any, is attributable initially to the retail dealer's injury who was either foreclosed from selling Peugeots or forced to sell a product against his wishes. Further, the retail dealer actually deprived of business, the purchaser unable to obtain a Peugeot, and perhaps, the retail dealer's competitors are the proper parties to bring this action as the ones directly injured. They possess sufficient self-motivation to efficiently enforce the antitrust laws. As counsel for PMA conceded in oral argument, this counterclaim would never have been filed if EAD, their buyer, had not begun a prior antitrust action against PMA. Reserving standing to the private party with the greatest risk of loss serves to effectuate the policy behind the antitrust laws.

PMA's claim is speculative and conceivably could lead to a multiple recovery. In order to succeed PMA must measure the loss of sales resulting from EAD's failure to appoint the best possible Peugeot dealer. The calculation would require determining the number of cars a good dealer would have sold versus the number of cars a reluctant Peugeot dealer did sell. Proof would vary depending on each individual retail dealer's purchasing preferences because Peugeot could be either the tied or tying product depending on the dealer's wishes. Further, assuming PMA recovers in this action, these retail dealers could maintain a similar action against EAD alleging identical losses and, although the damages perhaps could be apportioned ade-

quately, the danger of multiple recovery is clearly present.

When balancing the above factors, this Court finds that even were the damages allegedly suffered by PMA attributable to the antitrust laws, PMA is not an appropriate enforcer and cannot be granted private attorney general status.

As PMA has not delineated any antitrust injury nor shown that it was endowed with private attorney general status, Eastern Auto Distributors' motion to dismiss Counts One and Two of the counterclaim of Peugeot Motors of America is GRANTED and the same are DISMISSED.

IT IS SO ORDERED.