**OHIO–SEALY MATTRESS MANUFACTURING COMPANY, Sealy Mattress Company of Houston, Sealy Mattress Company of Puerto Rico, Inc., Sealy Mattress Company of Fort Worth, Sealy of The Northeast, and Sealy Mattress Company of Georgia, Plaintiffs,**

**v.**

**Morris A. KAPLAN, Sealy Mattress Company of Illinois, William H. Walzer, Sealy Connecticut, Inc., Sealy Greater New York, Inc., Waterbury Mattress Company, Morton H. Yulman, Sealy of Eastern New York, Inc., Sealy of Minnesota, Inc., Peter D. Brown, Sealy Mattress Company of Michigan, Inc., T. C. Englehardt, Jr., Fred G. Hodges Bedding Company (a/k/a Sealy Mattress Company of Reading, Pa.), Sealy of Des Moines, Inc., Walter Hertz, Sealy Mattress Company of New Jersey, Inc., Joseph V. Moffitt, Sealy of the Carolinas, Peerless Mattress Company, Lloyd B. Rosenfeld, Sealy Mattress Company of Oregon, Joseph R. Rudick, Maryland Bedding Company, James E. Thompson, Howard G. Haas, Sealy, Incorporated, Sealy Spring Corporation, Sealy Mattress Company of Colorado, Inc., Sealy Mattress Company of Northern California, Inc., Sealy Mattress Company of Southern California, Inc., Sealy Mattress Company of Arizona, Inc., Sealy Mattress Company of Florida, Inc., Sealy Mattress Company of Pittsburgh, Inc., and Sealy Mattress Company of Philadelphia, Inc., Defendants.**

No. 76 C 0810.

United States District Court,
N. D. Illinois, E. D.

July 20, 1982.

Frederic F. Brace, Jr., William H. Tobin, Sidley & Austin, Chicago, Ill., for plaintiffs.

Howard Koven, Phil C. Neal, Friedman & Koven, John H. Matheson, Hedlund, Hunter & Lynch, Max Wildman, Wildman, Harrold, Allen & Dixon, Henry S. Kaplan, Dressler, Goldsmith, Shore, Sutker & Milnamow, Robert H. Joyce, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Fred B. Miller, Portland, Or., Louis B. Garippo, Thomas J. Campbell, Winston & Strawn, James E. Hastings, Chadwell, Kayser, Ruggles, McGee & Hastings, Stanley B. Block, Vedder, Price, Kaufman & Kammholz, Samuel Weisbard, McDermott, Will & Emery, Edward I. Rothschild, Rothschild, Barry & Myers, Richard K. Wray, Arnstein, Gluck, Weitzenfeld & Minow, Eli E. Fink, Fink, Coff & Stern, Albert D. Jenner, Jr., Jenner & Block, Michael W. Coffield, Gregory A. Friedman, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This case is one of several related antitrust actions that have been filed over the past decade by Ohio-Sealy Mattress Manufacturing Company ("Ohio-Sealy") and its subsidiaries (collectively referred to herein as "Plaintiffs") against Sealy, Inc. ("Sealy") and its various subsidiaries, licensees, officers and directors (collectively referred to herein as "Defendants") seeking declaratory, injunctive and monetary relief for alleged anticompetitive conduct in the mattress manufacturing industry. This matter is presently before the Court on defendant's motion for summary judgment with respect to the issues set forth in sections II.D.(a) and (b) and section IV of the Schedule of Issues previously filed in this case and the parties' cross-motions for summary judgment on Sealy's amended counterclaim.[1]

For the reasons set forth below, defendants' motion for summary judgment will be denied with respect to the issue set forth in section II.D.(a), but granted with respect to the issues set forth in sections II.D.(b) and IV, and Sealy's motion for summary judgment on its counterclaim will be granted.

### I.

*Defendant's Motion For Summary Judgment on the Issues Set Forth in Sections II.D.(a) and (b) and Section IV of the Schedule of Issues*

The two principal issues toward which this motion is directed are: (1) whether plaintiffs are collaterally estopped from claiming in this action that they are entitled to equitable relief as to the exclusive manufacturing territories clause contained in the licensing agreement between Sealy and its licensees, assuming that plaintiffs can eventually show that the clause either applied alone or in combination with other alleged restraints violates the antitrust laws [Schedule of Issues Section II.D.(a) ]; and (2) whether plaintiffs have standing to seek relief in this action in connection with Sealy's acquisition of its Des Moines, Iowa, and Reading, Pennsylvania, licensees [Schedule of Issues Sections II.D.(b) and IV]. The Court referred this motion to Magistrate John Cooley for a report and recommendation on the merits. On June 4, 1981, Magistrate Cooley recommended that defendants' motion be denied in all respects and defendants have filed objections to the magistrate's report and recommendation pursuant to 28 U.S.C. § 636(b)(1).[2] After a careful and thorough review of the magistrate's report and recommendation, the memoranda filed by the parties both before the magistrate and in connection with the objections filed with the Court, and the prior

---

1. All other issues in *Ohio-Sealy Mattress Company v. Kaplan,* No. 76 C 0810, which have not previously been decided by this Court are presently being mediated. Discovery as to these issues is tolled during his mediation.

2. While the parties were engaged in active settlement discussions as to all issues in the case,

this Court delayed ruling on the report and objections. At the request of the parties, the Court is now ruling on this and the other matters set forth in the opinion, while the remaining portions of this case continue to be negotiated.

opinions of this Court and those of Judge Parsons that bear on the issues at hand, we conclude that Ohio-Sealy is not barred from seeking equitable relief with respect to the exclusive manufacturing territories clause and that Ohio-Sealy lacks standing to challenge Sealy's acquisition of its Des Moines and Reading licensees.

## A.

■ Section II.D.(a) of the Schedule of Issues provides in pertinent part:

> Plaintiffs ... contend that equitable relief must include at the very minimum: (a) elimination of the exclusive manufacturing territories provisions and related provisions adopted immediately after the April, 1975 jury verdict [in *Ohio-Sealy Mattress Manufacturing Company v. Sealy, Inc.*, No. 71 C 1243 (N.D.Ill. Parsons, J.)].

Defendants maintain that the issue of equitable relief with respect to the exclusive manufacturing territories clause within the temporal scope of the instant case was actually and fully litigated before Judge Parsons and necessarily decided by him in late 1979 in the context of the second equitable relief proceeding in *Ohio-Sealy Mattress Manufacturing Company v. Sealy, Inc.*, No. 71 C 1243 ("1971 case"), on remand from the United States Court of Appeals for the Seventh Circuit. In *Ohio-Sealy Mattress Manufacturing Company v. Sealy, Inc.*, 585 F.2d 821 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), the Seventh Circuit upheld a jury verdict in favor of plaintiffs and against defendants, but the Court of Appeals remanded the case for another hearing on equitable relief. On remand, Judge Parsons, who had presided at the trial of the 1971 case in 1974 and 1975 and the first hearing on equitable relief in 1976, declined to enjoin the exclusive manufacturing terri-

tories clause, though he did enjoin other provisions of the license agreement in order to prevent the conduct that the jury had found violative of the antitrust laws. Defendants argue that principles of collateral estoppel bar plaintiffs from raising the issue of equitable relief from the exclusive manufacturing territories clause in this case, which is temporarily limited to alleged unlawful conduct by defendants between April, 1975, and April, 1978,[3] since defendants' alleged application of the clause alone and in conjunction with other alleged restraints during that time period was before Judge Parsons in the 1979 equitable relief proceeding in the 1971 case. *Parklane Hosiery Company v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); Restatement (Second) of Judgments § 68 (Tentative Draft No. 4, April 15, 1977).

In an earlier opinion in this case dated February 4, 1981, this Court indicated after reviewing Judge Parsons' opinion on equitable relief in the 1971 case, that, in its view, Judge Parsons had confined his inquiry to whether defendants' pre-verdict conduct at issue in that case necessitated the equitable relief sought by plaintiffs in that case. *Ohio-Sealy Mattress Manufacturing Company v. Kaplan*, 90 F.R.D. 35, 38 (N.D.Ill.1981). Although we had held previously that defendants were precluded from seeking post-verdict damages in this case for pre-verdict conduct that was necessarily part of the 1971 case, we reiterated that our earlier decision:

> does not preclude plaintiffs from seeking equitable relief [in this case] based on [post-verdict] conduct; nor does Judge Parsons' recent ruling on equitable relief bar such a claim, since his ruling was based on the pre-verdict conduct at issue in that case.

*Id.* Defendants suggest, however, that our statement with respect to the scope of the

---

**3.** On February 27, 1981, this Court limited the temporal scope of this case to defendants' conduct between the April, 1975, jury verdict in the 1971 case and April, 1978, when Sealy changed the composition of its board of directors. *See Ohio-Sealy Mattress Manufacturing Company v. Kaplan*, 90 F.R.D. 40 (N.D.Ill.

1981). Plaintiffs are also seeking relief for alleged unlawful conduct after April, 1978, in *Ohio-Sealy Mattress Manufacturing Company v. Duncan*, 548 F.Supp. 75 (N.D.Ill.1982), for additional alleged wrongs in *Ohio-Sealy Mattress Manufacturing Company v. Haas*, No. 82 C 2488 (N.D.Ill.).

equitable relief proceeding conducted by Judge Parsons fails to take account of the issues actually litigated and necessarily decided by Judge Parsons in his written opinion at the conclusion of that proceeding. Thus, at defendants' urging, we have again reviewed Judge Parsons' opinion on equitable relief, but still cannot conclude that the issue of equitable relief from the exclusive manufacturing territories provision with respect to defendants' post-verdict conduct involved in this case was actually litigated or necessarily decided by Judge Parsons in such a way as to invoke the preclusive bar of collateral estoppel in this case.[4]

Although there are certain statements in Judge Parsons' opinion, as amended, that, taken out of context, could be construed as indicating that he considered both pre- and post-verdict conduct and the appropriate relief therefrom in fashioning the equitable relief with respect to the exclusive manufacturing territories clause in the 1971 case, the general tenor of the opinion and Judge Parsons' own statements as to what he was and was not deciding in that case compel a more narrow interpretation of his opinion. Judge Parsons was aware that Ohio-Sealy had filed several lawsuits against Sealy and others after the 1975 jury verdict challenging various actions taken by defendants subsequent to the jury verdict, yet he attempted to confine his inquiry to the conduct at issue in the 1971 case and the jury's findings in that regard. He stated that although he had been kept up to date as to the other litigation brought by Ohio-Sealy against Sealy,

> [n]one of these cases is before me for decision, nor should they be. The trial of this case was concluded in 1975, and the equitable relief I fashioned must be founded upon the findings of the jury that heard this case. Today's decree may have some effect upon both cases indirectly, but it should not be my purpose here to influence decisions yet to be made. Later decisions should be free to rest upon the facts peculiar to the cases in which they will be made.

*Ohio-Sealy Mattress Manufacturing Company v. Sealy, Inc.,* No. 71 C 1243 mem. op. at 29–30 (N.D.Ill. December 1, 1980, as amended January 30, 1981).

Whether Judge Parsons should have or could have considered defendants' post-verdict conduct in connection with the second equitable relief proceeding, his opinion indicates that he considered little, if any, post-verdict conduct as bearing on the issue of equitable relief from the exclusive manufacturing territories clause. Although Judge Parsons mentioned Sealy's post-verdict acquisitions of its Portland and San Diego licensees late in his opinion, he set them apart from the issues he felt relevant to his determination on equitable relief in the 1971 case. All of the examples of defendants' anticompetitive conduct cited and relied upon by the court in connection with its discussion of equitable relief related to pre-verdict activity. Moreover, Judge Parsons characterized Ohio-Sealy's additional evidence in the second equitable relief proceeding as "principally . . . a reiteration by [plaintiff's] expert, Dr. Mueller, of the positions he had taken in earlier testimony. . . ." *Id.* mem. op. at 29. While there are passages in Judge Parson's opinion and in the transcripts of the proceedings over which he presided that might support an argument that the question of equitable relief from the exclusive manufacturing territories clause was decided on a record that included some post-verdict conduct stretching through the temporal scope of the instant case, this Court cannot definitively say that such issues were actually litigated or necessarily decided in the context of the second equitable relief proceeding, which was essentially a belated adjunct to the 1975 jury verdict.

Defendants also argue that the court of appeals in *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.,* 585 F.2d 821 (7th Cir. 1978), "expressly acknowledged that the exclusive manufacturing territories clause was not itself objectionable." Thus, they contend that Ohio-Sealy should be precluded from challenging the clause in the con-

---

**4.** Magistrate Cooley reached the same conclu-    sion for similar reasons.

text of this case. But the court of appeals did not hold that the exclusive manufacturing territories clause was necessarily lawful under all possible circumstances. Rather, the court stated that:

> Repeatedly, Sealy argues that, e.g., areas of primary responsibility, exclusive manufacturing licenses, location clauses, passover payments, rights of first refusal, etc., have all been held at one time or another not to violate the antitrust laws. That is certainly true enough, but we know of no authority holding that these devices, alone or in conjunction, do not violate the antitrust laws *even though they have effects plainly within the ambit of those laws.* On the violation issue, Sealy consistently refuses to address what was obviously Ohio's case theory, on which the jury was appropriately instructed in agreed language. It is thoroughly established that "[a]cts which may be legal and innocent in themselves, standing alone, lose that character when incorporated into a conspiracy to restrain trade."

585 F.2d at 827–28 (citations omitted, emphasis in original).

Whether Ohio-Sealy will be able to show a violation of the antitrust laws brought about by the application of the exclusive manufacturing territory clause itself or in conjunction with other allegedly anticompetitive elements within the context of this case in order to justify the equitable relief it continues to seek is a very different question upon which we express no opinion at this juncture. We hold only that if such a violation should be proven, neither the opinion of the court of appeals nor Judge Parsons' opinion in the 1971 case would preclude Ohio-Sealy from seeking equitable relief therefrom in this case in the form of elimination of the exclusive manufacturing territories clause.

Accordingly, defendants' motion for summary judgment with respect to the issue set forth in section II.D.(a) of the Schedule of Issues is denied. It is so ordered.

## B.

The issue under section II.D.(b) of the Schedule of Issues is whether Ohio-Sealy may seek divestiture of the Reading and Des Moines licensees under section 16 of the Clayton Act, 15 U.S.C. § 26, in connection with its claim that Sealy's acquisition of those licensees in August, 1977, and April, 1978, respectively, violated section 1 of the Sherman Act, 15 U.S.C. § 1. The related issue presented by section IV of the Schedule of Issues is whether Ohio-Sealy may seek any relief for the Reading and Des Moines acquisitions under Count III of the amended complaint charging a violation of section 7 of the Clayton Act, 15 U.S.C. § 18. Defendants maintain that Ohio-Sealy lacks standing to challenge the Reading or Des Moines acquisitions under section 4 of the Clayton Act, 15 U.S.C. § 15, providing for private treble damage actions for violation of the antitrust laws because it did not compete in those markets nor had it taken any steps to enter those markets at the time of the acquisitions, and it never attempted to acquire the Reading or Des Moines licensees either before or after Sealy acted to acquire those licensees.

As a threshold matter, Ohio-Sealy argues that defendants are precluded from raising the standing issue because it is not included in defendants' arguments with respect to the Reading and Des Moines transactions set forth in the Schedule of Issues. It argues that our preclusion order of February 4, 1981, bars defendants from attacking the complaint on any ground not specifically raised in the Schedule of Issues. On the merits, Ohio-Sealy contends that it does have standing to challenge the acquisitions at issue because it is and was a potential competitor in the relevant markets. Ohio-Sealy also argues that the Reading and Des Moines acquisitions cannot be viewed in a vacuum but rather must be seen as part of a longstanding effort by Sealy to restrain intrabrand competition in the mattress manufacturing industry and that if Ohio-Sealy had not been prevented unlawfully from competing in areas adjacent to the Reading and Des Moines markets in the past, it would have been a substantial com-

petitive force in those markets at the time of the acquisitions challenged herein.

Magistrate Cooley was persuaded by Ohio-Sealy's threshold arguments and recommended that this Court consider imposing sanctions for defendants' violation of the preclusion order. With respect to the merits, the magistrate concluded that the standing question was fraught with disputed issues of material fact rendering it inappropriate for resolution on summary judgment.

■ As to the preliminary question of whether or not defendants may raise the standing argument despite the fact that it was technically not set forth in the Schedule of Issues, we note, as we did at the outset of our opinion on the preclusion order, that the Schedule of Issues "should not be used as a trap by which 'unwary counsel' are precluded from raising [otherwise meritorious] issues." *Ohio-Sealy Mattress Manufacturing Company v. Kaplan*, 90 F.R.D. 35, 36 (N.D.Ill.1981) (citation omitted). In the instant case, defendants' position with respect to the Reading and Des Moines acquisitions as set forth in the Schedule of Issues, filed with the Court on January 15, 1981, reflected some confusion concerning an earlier opinion of this Court issued on August 1, 1980, delineating the scope of this litigation. *See Ohio-Sealy Mattress Manufacturing Company v. Kaplan*, 90 F.R.D. 11 (N.D.Ill.1980). In the August 1 opinion, the Court had held that plaintiffs were barred from seeking damages in this case flowing from defendants' pre-verdict conduct at issue in the 1971 case for which monetary and equitable relief had already been awarded by Judge Parsons. As a result of the broad language in the August 1, 1980, opinion and a subsequent opinion dated September 17, 1980,[5] however, defendants assumed that plaintiffs were barred from seeking relief for the Reading and Des Moines acquisitions as well even though they actually occurred after the verdict in the 1971 case.

It was not until after our opinion dated February 4, 1981, in which we clarified our earlier opinions, that defendants realized that the Reading and Des Moines acquisitions were still part of the instant case. *See Ohio-Sealy Mattress Manufacturing Company v. Kaplan*, 90 F.R.D. 35, 37–39 (N.D.Ill.1981). At that time, the Court also ordered defendants to move for summary judgment with respect to some of the remaining issues in this case, including the Reading and Des Moines transactions. *Id.*, 90 F.R.D. at 40. It would thus be fundamentally unfair to limit defendants to the position they took in the Schedule of Issues with respect to the Reading and Des Moines acquisitions since the gist of defendants' argument therein was that the Court's previous orders had eliminated those claims from this case. Once those claims were "resurrected" after the Schedule of Issues was filed, defendants should not be precluded from challenging the basis of those claims. To decide otherwise would convert the Schedule of Issues, which is a useful device for simplifying the scope of a complex case, would be converted into a shield preventing defendants from raising questions that go to the very heart of plaintiffs' case because of some initial confusion regarding the temporal scope of this litigation.[6]

---

**5.** Certain passages in those opinions gave the impression that all of Ohio's claims with respect to the Reading and Des Moines acquisitions were barred on res judicata grounds. *See, e.g., Ohio-Sealy Mattress Manufacturing Company v. Kaplan*, 90 F.R.D. 11, 20 (N.D.Ill. 1980); *Ohio-Sealy Mattress Manufacturing Company v. Kaplan*, 90 F.R.D. 21, 24, n.4 (N.D. Ill.1980).

**6.** We also note that to the extent that defendants' position concerning Ohio's standing to challenge the Reading and Des Moines acquisitions raises a question with respect to this Court's subject matter jurisdiction, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), it may not be waived but may be asserted at any time throughout the proceedings, as well as on appeal. *Choudhry v. Jenkins*, 559 F.2d 1085, 1091 (7th Cir. 1977); *United States v. City of Philadelphia*, 482 F.Supp. 1248, 1252 n.1 (E.D.Pa.1979).

As to the merits of defendants' motion for summary judgment,[7] we do not agree with the magistrate that the question of standing in this case is not amenable to determination in the context of a motion for summary judgment. While the magistrate appeared to be generally reluctant to recommend taking a hotly-contested case like this away from the jury by a grant of summary judgment, he did not identify any specific material factual disputes that would preclude summary judgment as a matter of law. The Court, having reviewed the parties' briefs and the magistrate's report and recommendation, concludes that any dispute with respect to the standing question is essentially legal in nature. In similar contexts, courts have consistently found summary judgment to be an acceptable method of early resolution of the standing issue in antitrust cases that conserves "limited judicial time and resources." *Weit v. Continental Illinois National Bank & Trust Company*, 641 F.2d 457, 461 and 469 (7th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1309 and 1311 (9th Cir. 1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *Bosse v. Crowell Collier and Macmillan*, 565 F.2d 602, 606–07 (9th Cir. 1977); *John Lenore & Company v. Olympia Brewing Company*, 550 F.2d 495 (9th Cir. 1977).

Section 4 of the Clayton Act, 15 U.S.C. § 15, the statutory basis for private antitrust damage actions, provides, in pertinent part:

[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

The proliferation of treble damage suits in the federal courts as well as concerns about the potential inequity in multiple trebled damage liability for antitrust defendants and the attendant windfall recovery for antitrust plaintiffs has sparked judicial efforts to read reasonable limitations into the facially broad right of action contained in section 4.[8] The courts have struggled mightily with the question of standing in the antitrust context in order to limit the potentially limitless class of plaintiffs who might seek relief under the antitrust laws. Although volumes have been written on the subject,[9] the common threads that seem to run through each analysis, regardless of the label used by an individual court or commentator, focus on the question of causation in a particular factual context and the notion that the plaintiff's alleged injury must be of a competitive nature that the antitrust laws were designed to protect against. *See Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977); *Bichan v. Chemetron Corporation*, 681 F.2d 514 (7th Cir. 1982); *Weit v. Continental Illinois National Bank & Trust Company*, 641 F.2d 457, 469 (7th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Mid-West Paper Products Co. v. Continental Group*, 596 F.2d 573, 582–83 (3d Cir. 1979).

---

**7.** Ohio purports to only having "outlined" its opposition to the merits of defendants' motion in light of its position that the standing issue is not properly before the Court. Its "outline," however, is fairly detailed, complete with argument and case citations. Accordingly, the Court does not deem additional briefing to be necessary to a resolution of defendants' motion on the merits.

**8.** As the court stated in *Lupia v. Stella D'Oro Biscuit Company, Inc.*, 586 F.2d 1163, 1168 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979), "[i]t would appear the circuits all view the treble damages suit as too lethal a cannon to put in the hands of anyone who has suffered only an 'indirect,' 'secondary,' or 'remote' injury." *See also Mid-West Paper Products Co. v. Continental Group*, 596 F.2d 573, 583 (3d Cir. 1979).

**9.** *See, e.g.,* Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809 (1977); Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv.L.Rev. 1127 (1976); Areeda & Turner, *Antitrust Law* § 333 *et seq.* (1978).

The United States Court of Appeals for the Seventh Circuit, together with courts in several other circuits, apparently utilizes the "target area" approach to determine whether the causation element of standing has been satisfied.[10] The target area test focuses on the relationship between the plaintiff and the area of the economy affected by the defendants' alleged anticompetitive behavior. *Bichan v. Chemetron Corporation, supra,* 681 F.2d at 516; *In re Multidistrict Vehicle Air Pollution,* 481 F.2d 122, 127–28 (9th Cir.), *cert. denied sub nom.,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51, 55 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). If the plaintiff can show that he has suffered injury to his business or property as a consequence of his presence in an area of the economy foreseeably endangered by a breakdown in competitive conditions attributable to the defendant's actions, he is deemed to be within the target area of the particular substantive antitrust violation alleged. *Lupia v. Stella D'Oro Biscuit Company,* 586 F.2d 1163, 1168–69 (7th Cir. 1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979); *Solinger v. A & M Records, Inc.,* 586 F.2d 1304, 1310 (9th Cir. 1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979).

As a further means of winnowing down the class of potential antitrust plaintiffs, the courts have recently emphasized that the plaintiff's injury must be of a type that the antitrust laws were designed to prevent. *J. Truett Payne Co., Inc. v. Chrysler Motors Corporation,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc., supra; Bichan v. Chemetron Corporation, supra.* Whether this requirement of "antitrust injury" is viewed as the final stage in a proper standing analysis or as a separate element of the plaintiff's substantive cause of action under a particular section of the antitrust laws, it is clear that it must be established as a threshold matter before the plaintiff will be entitled to relief under the antitrust laws. *Bichan v. Chemetron Corporation, supra; Weit v. Continental Illinois National Bank & Trust Co., supra; Mid-West Paper Products Co. v. Continental Group, supra.*[11] Together, the general standing requirement focusing on causation and the notion of antitrust injury insure that the plaintiff's alleged injury is both traceable to the defendant's conduct and cognizable under the antitrust laws.

It is important to apply the target area test with reference to the particular substantive antitrust violation alleged. Accordingly, in view of the rather broad scope of section 1 of the Sherman Act proscribing any contract, combination or conspiracy in restraint of trade,[12] courts have held that

10. *See Bichan v. Chemetron Corporation,* 681 F.2d 514 at 517 (7th Cir. 1982); *Weit v. Continental Illinois National Bank & Trust Company,* 641 F.2d 457, 469 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Schwimmer v. Sony Corp. of America,* 637 F.2d 41 (2d Cir. 1980); *Lupia v. Stella D'Oro Biscuit Company,* 586 F.2d 1163, 1168 (7th Cir. 1978). *See also Solinger v. A & M Records, Inc.,* 586 F.2d 1304 (9th Cir. 1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *John Lenore & Company v. Olympia Brewing Company,* 550 F.2d 495, 509 (9th Cir. 1977); *Dailey v. Quality School Plan, Inc.,* 380 F.2d 484, 487–88 (5th Cir. 1967); *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.,* 368 F.2d 679, 688–89 (8th Cir. 1966); *Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414 (4th Cir.), *cert. denied,* 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

11. As the court noted in *Weit v. Continental Illinois National Bank & Trust Company,* 641 F.2d 457, 469 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982):

> the distinction between the antitrust injury requirement of Section 4 and the more general standing requirement is often blurred... This is not surprising in antitrust actions as the two requirements overlap considerably. The labels are not important however. The fundamental requirement is that plaintiffs establish a sufficient nexus between the defendant's alleged actions and an injury to the plaintiffs.

*See also Mid-West Paper Products Co. v. Continental Group,* 596 F.2d 573, 582–83 (3d Cir. 1979).

12. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in pertinent part that "[e]very con-

not only existing competitors in the affected market but also "prospective [competitors] who have taken substantial demonstrable steps to enter an industry and who [are] thwarted in that purpose by antitrust violations" have suffered, potentially, the type of injury to their business or property that section 1 was intended to protect against. *Solinger v. A & M Records, Inc., supra,* 586 F.2d at 1309; *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 994 (D.C.Cir.), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1977). Some courts have held, however, that the plaintiff must be an actual "component of the competitive infrastructure" or a "component of competitive significance" in the affected market in order to complain of a violation of section 7 of the Clayton Act proscribing mergers or acquisitions that may substantially lessen competition or tend to create a monopoly in any line of commerce.[13] *Solinger v. A & M Records, Inc., supra,* 586 F.2d at 1312; *Bosse v. Crowell Collier and Macmillan,* 565 F.2d 602, 607 (9th Cir. 1977); *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 500 (9th Cir. 1977).

■ The narrower class of potential plaintiffs in a section 7 action is said to be justified because of the more limited type of activity proscribed by that provision.

*Solinger v. A & M Records, Inc., supra,* 586 F.2d at 1312 n. 9. At the same time, however, section 7 is consistently characterized as a broad prophylactic provision intended to arrest anticompetitive activity in its incipiency. *F. T. C. v. Procter & Gamble Company,* 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967). Although most courts that have considered the question of a potential competitor's standing under section 4 have done so in the context of a suit challenging allegedly anticompetitive conduct under section 1 or 2 of the Sherman Act,[14] we are not necessarily prepared to hold that a potential competitor may never have standing to challenge an allegedly anticompetitive merger or acquisition under section 7. In our view, a potential competitor who has reached an advanced stage of preparedness to enter a particular market and who has taken substantial demonstrable steps directed toward that end may have suffered an injury to its business or property within the meaning of section 4 so as to maintain a cause of action for a violation of section 7 as well as sections 1 and 2 so long as a sufficient causal connection can be established between defendant's alleged acts and plaintiff's injuries and those injuries are cognizable under the antitrust laws.[15]

tract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal."

**13.** Section 7 of the Clayton Act, 15 U.S.C. § 18, provides in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. . . .

  *   *   *   *   *   *

**14.** In addition to those cases cited in the text, *see Woods Exploration and Producing Co. v. Aluminium Co. of America,* 438 F.2d 1286, 1310 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *Martin v.*

*Phillips Petroleum Co.,* 365 F.2d 629, 633–34 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 602, 17 L.Ed.2d 450 (1966); *Denver Petroleum Co. v. Shell Oil Co.,* 306 F.Supp. 289, 307–08 (D.Colo.1969); *Waldron v. British Petroleum Co.,* 231 F.Supp. 72, 81–82 (S.D.N.Y.1964); *Deterjet Corp. v. United Aircraft Corp.,* 211 F.Supp. 348, 353 (D.Del.1962).

**15.** It is generally recognized that standing to seek injunctive relief for a violation of the antitrust laws pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, is more easily obtained than is standing to seek treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15. *Mid-West Paper Products Co. v. Continental Group,* 596 F.2d 573, 590–94 (3d Cir. 1979); *Universal Brands, Inc. v. Phillip Morris, Inc.,* 546 F.2d 30, 34 (5th Cir. 1977). In order to seek injunctive relief under section 16, a plaintiff need only demonstrate that it is threatened with injury attributable to defendant's alleged anticompetitive conduct. *Id.* Inasmuch as we conclude below that Ohio-Sealy does not have standing to seek relief under section 1 of the

■ Applying these standards to the case at bar, however, the undisputed facts compel the conclusion that Ohio-Sealy is not within the target area affected by Sealy's allegedly unlawful acquisition of the Reading and Des Moines licensees for purposes of asserting a violation of either section 1 of the Sherman Act or section 7 of the Clayton Act. Moreover, it suffered no antitrust injury thereby for which relief might be available within the context of this case. During the ten years preceding Sealy's acquisitions of its Reading and Des Moines licensees, Ohio-Sealy did not make *any* sales in the Des Moines area and made only $1,467 worth of sales in the Reading area in only one of those years, 1978, amounting to just .0479% of total Sealy-label sales in the Reading market for that year. Under any standard, Ohio-Sealy's sales in the Reading market in 1978 are *de minimis*. Moreover, at no time relevant herein did Ohio-Sealy take any tangible steps to enter the Reading or Des Moines markets either by acquisition or direct sales competition that might have been thwarted or even affected by Sealy's allegedly unlawful acquisitions of its licensees in those markets. At the time Sealy moved to acquire its Reading licensee, there were no competing bidders for that market. Furthermore, Sealy acquired its Des Moines licensee by the exercise of its contractual right of first refusal in order to preempt an agreement whereby Sealy's Detroit and Portland licensees had arranged to purchase substantially all of Des Moines' assets.[16] Ohio was not even tangentially involved in either transaction.

Ohio-Sealy seems to concede that it was not an existing competitor in the Reading or Des Moines markets at the time of the acquisitions at issue in this case, but it argues that it was a potential competitor because it "is always looking for ways to expand, by acquisition or otherwise." It is clear, however, that in order to be a potential competitor within the target area of alleged anticompetitive conduct, a plaintiff must have taken "substantial demonstrable steps to enter an industry." *Solinger v. A & M Records, Inc., supra,* 586 F.2d at 1309; *Hecht v. Pro-Football, Inc., supra.* Ohio-Sealy has brought forth no evidence of any steps it took to enter the Reading or Des Moines markets either before or during the acquisitions in question. The mere amorphous desire to expand into new markets in general is insufficient to bring a plaintiff within the class of persons entitled to complain of such conduct at the time it occurred.

■ Ohio-Sealy maintains that it was already a competitive force in the mattress manufacturing industry as a whole at the time of the Reading and Des Moines acquisitions and, thus, that it need not establish its presence as an existing or potential competitor in particular local markets in order to have standing to sue for alleged anticompetitive conduct in those markets. Ohio contends that it was reasonably foreseeable that it would be affected in some way by whatever happened in the Reading and Des Moines markets by virtue of its very existence. The Supreme Court has emphasized on more than one occasion, however, that the antitrust laws are not meant to protect particular competitors, but rather competition itself. *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc., supra,* 429 U.S. at 488, 97 S.Ct. at 697; *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). It necessarily follows that if a company does not compete in a given area of the economy and if it has taken no steps to enter that area, it may

---

Sherman Act or Section 7 of the Clayton Act, we need not reach the "vexed question" of whether the divestiture sought by Ohio-Sealy would be available to a private litigant under section 16 as an equitable remedy for a violation of the antitrust laws. *Berkey Photo, Inc. v. Eastman Kodak Company,* 457 F.Supp. 404, 428 (S.D.N.Y.1978).

**16.** Indeed, the Detroit licensee, Sealy Mattress Company of Michigan, Inc., subsequently filed suit in its own right against Sealy alleging a violation of the antitrust laws as a result of the Des Moines acquisition. *See Sealy Mattress Company of Michigan, Inc. v. Sealy, Inc.,* No. 80 C 4676 (N.D.Ill.). Ohio-Sealy has not joined in that suit.

not complain of supposed diminution in competition in that area.[17]

Moreover, both courts and commentators have noted that the concept of foreseeability in antitrust actions only operates negatively to reduce the class of plaintiffs who might properly complain of allegedly anticompetitive conduct. It may not be used to expand the number of potential plaintiffs in the target area nor is it a sufficient independent basis for standing. *See Mid-West Paper Products Co. v. Continental Group,* 596 F.2d 573, 581 n.27 (3d Cir. 1979); Areeda and Turner, *Antitrust Law* § 341c at p. 220 (1978); Berger & Bernstein, *An Analytical Framework for Antitrust Standing,* 86 Yale L.J. 809, 835 (1977). As the court stated in *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 499 (9th Cir. 1977):

> [a]ntitrust violations admittedly create many foreseeable ripples of injury to individuals, but the law has not allowed all of those merely affected by the ripples to sue for treble damages. Congress, in passing this legislation, did not intend to protect every possible or potential injury which could remotely be connected to a corporate merger or acquisition.

*See also Calderone Enterprises, Inc. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295–96 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).

Finally, Ohio-Sealy maintains that the Court should not view the Reading and Des Moines acquisitions in a vacuum since it might have been a significant competitor in those markets if it had not been kept out of adjacent markets by Sealy's prior unlawful acquisitions in those neighboring areas.

Thus, Ohio-Sealy argues that the Reading acquisition must be viewed in conjunction with Sealy's pre-verdict acquisitions of its Pittsburgh and Philadelphia licensees, which together allegedly foreclosed Ohio from the entire state of Pennsylvania. Furthermore, under this line of reasoning, the Des Moines acquisition would be viewed in conjunction with Sealy's pre-verdict acquisitions of its Denver, Arizona, and two California licensees, which together with Sealy's subsequent acquisition of its Portland licensee in 1979 allegedly foreclosed Ohio-Sealy from much of the western United States. This final argument exposes the underlying weakness in Ohio's entire challenge to the Reading and Des Moines acquisitions for it establishes that to the extent it has been foreclosed at all from the Reading or Des Moines markets, such injury does not stem from the acquisitions challenged in the context of this case but, rather, from conduct that was the subject of prior litigation, since resolved, between these parties.

As we noted earlier in this opinion, prior rulings in this case establish that the temporal scope of this case is limited to post-verdict conduct occurring between April, 1975, and April, 1978. *Ohio-Sealy Mattress Manufacturing Company v. Kaplan,* 90 F.R.D. 40 (N.D.Ill.1981). In this context, we have repeatedly rejected plaintiff's claims for post-verdict damages attributable to pre-verdict conduct on the basis of the application of res judicata and satisfaction of judgment principles. In so doing, the Court expressly stated that:

> It is clear that Ohio may sue only for those damages which occur as a result of some post-verdict act. *The mere allegation that the post-verdict acts were but a*

---

**17.** It is interesting to note that, during the trial of the 1971 case, Ohio-Sealy proved that the mattress business was essentially local in nature, thereby further undercutting its argument, advanced herein, that its presence in the industry as a whole entitles it to complain of a diminution in competition in a local market in which it does not compete. As the court of appeals stated in *Ohio-Sealy Mattress Manufacturing Company v. Sealy, Inc.,* 585 F.2d 821, 828 (7th Cir. 1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979):

> Ohio proved that the mattress business is substantially local in nature, because of the bulk and weight of the product, the fact that retailers typically do not care to warehouse the product and the need for frequent customer sales calls. As Sealy concedes, the great majority of mattress sales are made within 200–300 miles of a manufacturing plant.

*continuation of the pre-verdict conspiracy is insufficient to entitle Ohio to damages in addition to those which it has received to remedy defendants' pre-verdict conduct.*

*Ohio-Sealy Mattress Manufacturing Company v. Kaplan,* 90 F.R.D. 11, 19 n. 15 (N.D.Ill. 1980) (emphasis supplied, citation omitted).

Although the Reading and Des Moines acquisitions occurred after the 1975 jury verdict and thus are technically within the temporal scope of this case, it is clear that Ohio-Sealy has not suffered injury within the context of this case because of those acquisitions. Rather, its claimed injury, under its own theory of its case, is attributable to defendants' prior unlawful conduct in keeping Ohio-Sealy out of neighboring markets. Ohio-Sealy's inability to compete effectively in the Reading and Des Moines areas during the time period involved in this case is apparently a direct outgrowth of that prior unlawful conduct for which defendants previously have been held liable and plaintiffs already compensated. As we have stated earlier, the Court will not allow plaintiffs to reargue their asserted right to relief for pre-verdict conduct in this case. *Id.*

Accordingly, for the reasons set forth above, defendants' motion for summary judgment on the issues set for in sections II.D.(b) and IV of the Schedule of Issues is granted. It is so ordered.

## II.

### Cross-Motions For Summary Judgment on Sealy's Counterclaim for Unpaid Royalties and Late Charges

Article VII of the 1975 Sealy Uniform License Agreement between Sealy and its licensees provides that the licensees shall pay to Sealy certain royalties on their net sales of "Sealy Products," defined in article I.A. as products bearing the Sealy trademark as well as non-Sealy mark products manufactured by a licensee with Sealy's approval. The license agreement also provides that Sealy is entitled to a late charge equal to one percent per month for late payment of royalties due under article VII. *See* Article VII.F.

Plaintiffs, Ohio-Sealy and its subsidiaries, paid royalties when due to Sealy as provided by the license agreement from the date of the April, 1975, verdict in the 1971 case through March 15, 1976. Thereafter, plaintiffs began withholding royalties from Sealy. On April 12, 1979, however, plaintiffs paid the accumulated royalties due for the period from March, 1976, to October, 1977, and from October, 1976, through March, 1979, under protest though they withheld the accumulated royalty increases for that period and accrued late charges of one percent per month. In the context of the instant case covering the period between the April, 1975, jury verdict and April, 1978, plaintiffs contend that the royalties, royalty increases and late charges sought by Sealy in its counterclaim were assessed and computed contrary to the license agreement and in violation of the antitrust laws as a matter of law. Sealy maintains that the royalties, royalty increases and late charges sought in the counterclaim were correctly assessed and computed and that such assessments do not violate the antitrust laws in any way as a matter of law.

As a threshold matter, Ohio-Sealy requests that the Court stay consideration of the merits of the counterclaim and order that the contract issues with respect to the royalties and late charges be submitted to binding arbitration as required by article XVI of the license agreement. Notwithstanding the strong federal policy in favor of arbitration, courts may look to equitable considerations of waiver and estoppel in determining whether to order arbitration. *Midwest Window Systems, Inc. v. Amcor Industries, Inc.,* 630 F.2d 535 (7th Cir. 1980). Waiver will be found where the party seeking to invoke the right to arbitration has taken some action inconsistent with the exercise of that right and the party opposing arbitration has been prejudiced by that inconsistency. *Id.,* 630 F.2d at 536–37.

In the context of the instant case, Ohio-Sealy has clearly waived its right to insist upon arbitration of the royalty dis-

pute. For almost five years Ohio-Sealy has consistently articulated its position that it stood ready to resolve the royalty dispute by litigation or arbitration, whichever route Sealy should choose. *See* Exhibits 1 through 5 attached to Sealy's Memorandum in Support of Summary Judgment. To that end, Sealy has continually attempted to have its royalty claim heard in court with motions before three different judges in the context of both this and the 1971 case without objection from plaintiffs as to the appropriate forum. During this time, both parties have engaged in extensive discovery, document production and analysis, and briefing regarding the merits of the royalty dispute. Ohio-Sealy's first objection to the resolution of this dispute by litigation rather than arbitration came during the briefing of the instant motion for summary judgment. Having consistently maintained that it stood ready to resolve the question of the royalties and attendant charges by arbitration *or* litigation at Sealy's pleasure, Ohio-Sealy cannot now be heard to complain that Sealy made the wrong choice.[18]

Ohio Sealy also contends that Sealy is not entitled to any royalties under the license agreement because Sealy allegedly breached the agreement by failing to seek arbitration of the royalty dispute. It argues that Sealy's alleged failure to perform all the terms and conditions of the license agreement should prevent Sealy from enforcing the royalty provision. Even if the Court were to agree with Ohio-Sealy's convoluted contract theory, the appropriate remedy would be for the Court to order arbitration rather than to foreclose Sealy from enforcing any portion of the license agreement. As discussed above, however, the Court finds no breach of the arbitration provision by Sealy but rather waiver of its applicability by plaintiffs.

On the merits, Ohio-Sealy advances a plethora of theories in support of its position that the royalty provision and the several royalty increases violate the antitrust laws and are therefore unenforceable. It is well settled that an alleged antitrust violation is no defense to the enforcement of a contract unless the effect of the judgment of the court would be to enforce the precise conduct made unlawful under the antitrust statutes. *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 751–57, 67 S.Ct. 1015, 1019–21, 91 L.Ed.2d 1219 (1947). In the case at bar, however, enforcement of the royalty provision in the license agreement would necessarily involve judicial approval of the very conduct that is alleged to violate the antitrust laws. Accordingly, we proceed to a discussion of plaintiffs' various antitrust theories with respect to the royalties on Sealy products.

Ohio-Sealy's first argument seems to be that Sealy uses the royalties unlawfully to subsidize itself and its subsidiaries in competition with Ohio-Sealy in violation of section 1 of the Sherman Act.[19] Ohio-Sealy cites no authority in support of this novel attack on the royalties due on net sales of Sealy products, however, and the Court has not found any reported decisions that deal with a subsidization claim under these circumstances. Although not precisely on point, those courts that have dealt with the propriety of a manufacturer's subsidization of selected dealers have indicated that such subsidization in an intrabrand context does not constitute an unreasonable restraint of trade absent evidence of predatory conduct or proof that the unsubsidized dealer was rendered unprofitable thereby or forced out

---

**18.** Even if we were to hold that plaintiffs had not waived their right to arbitration of the royalty question, we would not order arbitration in this case at the present time. As set forth more fully below, the antitrust issues in this aspect of the case so permeate the contract questions that remand to an arbiter would be inappropriate in any event until the Court settles the antitrust questions involved. *Applied*

*Digital Technology, Inc. v. Continental Casualty Company*, 576 F.2d 116 (7th Cir. 1978).

**19.** Ohio-Sealy also argues that Sealy has used the royalty increases over the years to subsidize this litigation and that such subsidization constitutes a violation of section 1 of the Sherman Act.

of business with resultant anticompetitive effects. *See, e.g., Lee Klinger Volkswagen, Inc. v. Chrysler Corporation,* 583 F.2d 910 (7th Cir. 1978); *Martin B. Glauser Dodge Company v. Chrysler Corporation,* 570 F.2d 72 (3d Cir. 1977). Like the respondent in *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the unsubsidized dealer who still manages a profit is forced to argue that there is too much competition for his tastes rather than too little. But as the Supreme Court said in *Brunswick,* such a claim is not cognizable under the antitrust laws. *Id.,* 429 U.S. at 487, 97 S.Ct. at 696–97.

In the case at bar, it is undisputed that Ohio-Sealy and its subsidiaries are efficient, profitable companies. There is absolutely no evidence or even an allegation that the royalties on Sealy products are exacted or used in a predatory manner. Accordingly, Ohio-Sealy's subsidization claim must fail.

Ohio-Sealy next argues that Sealy is not entitled to that portion of the royalties resulting from increases in the royalty rate during the period in which the Sealy board of directors was "illegally" constituted in violation of section 8 of the Clayton Act, 15 U.S.C. § 19, in that most of the Sealy board members also sat on the boards of its licensees. Section 8, however, does not purport to "disqualify" directors or nullify corporate action taken by those directors during the time in which they sit in violation of the Act. That section merely forbids interlocking directorates, as defined therein, and specifies distinct remedies, not including nullification of corporate actions, for violations of its terms. Even if a board of directors sitting in violation of section 8 could be considered to be not a "de jure" board, it is hornbook law that,

[i]n general, the contracts and acts of de facto officers, when action within the scope of their authority, are just as binding as the acts of officers de jure, at least so far as third persons are concerned. . . . A de facto board of directors may legally perform such acts as are within the scope of the business of the corporation. . . .

2 Fletcher, *Cyclopedia of Corporations,* (Perm.Ed.) § 380, p. 215. Ohio-Sealy has cited no authority in support of its strained, defensive use of section 8 and the Court has not found any through its own efforts.[20] Accordingly, plaintiffs' section 8 claim must also fail.

For purposes of the preceding discussion, there was no need to distinguish between royalties due on products bearing the Sealy trademark and those due on non-Sealy trademark products manufactured with Sealy's approval. Ohio-Sealy argues, however, that Sealy is not entitled to royalties on non-Sealy mark products manufactured for Sears Roebuck and Company because Sealy never approved Ohio-Sealy's production of the Sears bedding within the meaning of article I.A. of the license agreement[21] and because Sealy's practice of coercing its licensees to pay royalties on both Sealy mark and non-Sealy mark products constitutes an unlawful use of its trademark in violation of sections 1 and 2 of the Sherman Act. *Zenith Radio Corporation v. Hazeltine Research, Inc.,* 395 U.S. 100, 133–41, 89 S.Ct. 1562, 1582–86, 23 L.Ed.2d 129 (1969).

With respect to the issue of Sealy's approval of the production of non-Sealy mark Sears bedding, the undisputed evidence in the record together with the reasonable inferences to be drawn therefrom establish that Sealy approved of Ohio-Sealy's production of the Sears bedding within the meaning of article I.A. of the license agreement

---

**20.** Ohio-Sealy's attempted defensive use of section 8 would also probably be barred by the policy expressed in *Bruce's Juices* and *Kelly, supra,* since enforcement of the royalty increases would not result directly in a violation of section 8. The violation would be complete once the allegedly illegally constituted board sat as a body.

**21.** Article VII of the license agreement requires payment of royalties on a licensee's net sales of "Sealy Products." "Sealy Products" are defined in article I.A. of the license agreement as products bearing the Sealy mark or those that "are produced, with Sealy's approval, in Licensee's plant at a location enumerated in Section II."

as a matter of law. The license agreement does not require any particular manner of approval in order to bring a specific product manufactured and sold by a licensee within the ambit of "Sealy Products" upon which royalties must be paid. The record in the instant case does reveal, however, that Ohio-Sealy's production and sale of the Sears bedding was brought to the attention of Sealy on at least two occasions upon which Sealy took note of the Sears business and affirmatively acted to enable Ohio-Sealy to develop that business. On September 28, 1977, Mr. Ernest Wuliger, the president of Ohio-Sealy, wrote to the president of Sealy requesting approval to build a new plant in Georgia in order "to handle our increased volume, which includes Sears Roebuck." Mr. Haas secured board approval for Ohio-Sealy's request and wrote back to Mr. Wuliger on October 14, 1977, stating that "[w]e trust that the expanding business to which you refer, including the Sears business, will enable you to take full advantage of the increased capacity and greater efficiency that the new facility will provide." Later, in August, 1978, Mr. Wuliger wrote to Mr. Haas requesting permission to deliver the "no-name" Sears Harmony House mattresses in "Sealy" trucks in light of some earlier confusion over the delivery of non-Sealy mark mattresses in trucks bearing the Sealy mark. Mr. Haas responded in November, 1978, stating that "[w]e do not interpret the license agreement or the Policies and Procedures Manual as forbidding you from using your regular trucks for the delivery of Sears Harmony House mattresses."

The only reasonable inference that could possibly be drawn from the evidence in the record is that Sealy expressly approved of Ohio-Sealy's production and sale of non-Sealy mark bedding. Indeed, Sealy acted to enhance Ohio-Sealy's ability to service that market. Ohio-Sealy has not brought forth any evidence that would support a contrary inference and its mere unsubstantiated assertion that Sealy did not approve of the production of the Sears bedding within the meaning of the license agreement, without more, cannot defeat summary judgment on this point.

There is also no dispute with respect to the lawfulness of Sealy's system of exacting royalties on sales of both Sealy mark and non-Sealy mark products as far as the Sears bedding is concerned that precludes summary judgment on that point. In *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* the Supreme Court held that the grant of a patent license may not be *conditioned* upon the payment of royalties on products that do not use the patent. The Court expressly reaffirmed the rule of *Automatic Radio Manufacturing Company v. Hazeltine Research, Inc.,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), that a patent owner could negotiate for royalties on total sales, whether or not all sales used the patent, as a convenient measure of the value of the license. 395 U.S. at 137–38, 89 S.Ct. at 1584. But the refusal to license on any other terms would constitute misuse of the patent, according to the Court, although no inference of such conditioning could properly be made simply because a license provision calls for royalties on total sales. 395 U.S. at 139, 89 S.Ct. at 1585. The Court thus remanded the case for a determination as to whether the respondent had conditioned the grant of its patent license upon payment of royalties on sales of unpatented as well as patented products. Finally, the Court in *Zenith* noted that a finding of patent misuse would not necessarily result in a violation of section 1 or 2 of the Sherman Act, 395 U.S. at 140, 89 S.Ct. 1585, though the lower courts have found that such misuse of a patent or trademark does violate the antitrust laws and, in appropriate cases, may excuse the payment of royalties otherwise due. *See Carpa, Inc. v. Ward Foods, Inc.,* 536 F.2d 39, 50 (5th Cir. 1976).

█ In our view, the lawfulness of Sealy's system of exacting royalties on total sales was decided in Sealy's favor in the context of the appeal of the verdict in the 1971 case, *Ohio-Sealy Mattress Manufacturing Company v. Sealy, Inc.,* 585 F.2d 821, 838–39 (7th Cir. 1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), and that determination must be given col-

lateral estoppel effect in the case at bar. The court of appeals found that Ohio-Sealy had failed to show that Sealy conditioned the grant of a license upon payment of royalties on total sales. Rather, the court of appeals found that ". . . extensive negotiations were in fact had over agreement provisions, and Ohio was able to obtain revisions in the proposed agreement," and it concluded that "[t]here was no evidence that Ohio sought to eliminate the non-Sealy royalties which no doubt would have resulted in a higher royalty on Sealy-brand products." 585 F.2d at 839. The Seventh Circuit also stated that:

> [m]oreover, Sealy obtained royalties not merely for the bare license of its trademark, but also for significant advertising, technical, and other services. To argue that none of the services provided in the package could have benefited the licensed plants other than in the production and sale of Sealy-brand products is to far outrun the facts in the record.

Ohio-Sealy has brought forth no evidence nor has it argued that the 1975 license agreement at issue in this case was any different than earlier agreements with respect to the royalty provision and there is no evidence or argument that the negotiations surrounding the 1975 agreement were any different than those concerning earlier agreements. Ohio-Sealy does argue, however, that Sealy provides less services with respect to the sales of Sears bedding than it provided with respect to the sales to Montgomery Ward & Company at issue in the 1978 appeal because Ward's was involved in Sealy's "national accounts" program and that the lack of Sealy services that benefit the Sears bedding is relevant to the question of conditioning. But it remains undisputed that Sealy provides a variety of services to its licensees, as the court of appeals noted, and it can hardly be said that some of those services, including specialized manufacturing and administrative know-how, plant lay-out assistance, sales training programs, labor-relations assistance, computer programs, etc., do not benefit Ohio-Sealy in its ability to service an account like Sears with non-Sealy mark products. As the court noted in *Zenith, supra,* the assessment of royalties on total sales may be a "convenient method" of determining the value of a license. 395 U.S. at 137, 89 S.Ct. at 1584. That appears to be the situation in the case at bar.

Lastly, Ohio-Sealy has mustered an assortment of theories in support of its argument that Sealy may not exact late charges of one percent per month on the royalties payable on Sealy Products. The Court has carefully reviewed each of Ohio-Sealy's theories and concludes that none has any merit. The provision regarding late charges is unconditional and unequivocal: "Sealy shall have the right to assess a charge of one percent (1%) per month for late payment of royalties." Article VII.F. Ohio-Sealy's contention that late charges may not be assessed without written notice or if a licensee contests the payment of royalties in good faith is based on language in Article VII.F. relating to the procedure on *termination* of a licensee for non-payment of royalties, *not* the assessment of late charges upon royalties that have been withheld. Ohio-Sealy's argument that the one percent per month late charge provision is unenforceable as a penalty is refuted by the case law, *United Order of American Bricklayers v. Thorleif Larsen & Son, Inc.,* 519 F.2d 331 (7th Cir. 1975), and the charge is not usurious because it does not involve a loan of money, *Clemens v. Crane,* 234 Ill. 215, 84 N.E. 884, 889 (1908).[22] Ohio-Sealy's theory that equity should bar the collection of late charges because Sealy waited too long to assert its rights is supported neither by law nor the facts of this case. Finally, Ohio-Sealy's challenge to the computation of the charges must fail in light of the clear procedure mandated by the Sealy Policies and Procedure Manual followed in this case. *See* Sealy Policies and Procedures Manual at § VII(e) at p. 8.

---

**22.** Even if this case did involve a loan, a loan to a corporation is not within the Illinois usury statute. Ill.Rev.Stat. ch. 74, § 4(1)(a).

Accordingly, Sealy's motion for summary judgment is granted with respect to royalties and late charges due on sales of both Sealy mark products and non-Sealy mark products including the Sears bedding. It is so ordered.